IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KATHY J. JACOWSKI,

OPINION AND ORDER

                      Plaintiff,

                                              15-cv-657-bbc

              v.

KRAFT HEINZ FOODS COMPANY,
AETNA LIFE INSURANCE COMPANY and
KRAFT FOODS GROUP, INC. EMPLOYEE-PAID
GROUP BENEFITS PLAN,

                      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this civil suit for monetary relief, plaintiff Kathy Jacowski contends that defendants violated her rights under the Employment Retirement Income and Security Act, 29 U.S.C. § 1132(a)(1)(B), by terminating her long term disability benefits arbitrarily and capriciously without a full and fair review and refusing to consider her voluntary appeal as mandated by the plan.   Jurisdiction is present under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). Before the court are the parties' cross motions for summary judgment, dkts. ##48 and 53, and defendants' motion, dkt. #68, to strike certain portions of the declaration of Brianna Covington.

Plaintiff asserts that the decision to terminate her long-term disability benefits was arbitrary and capricious for five reasons:  (1) in terminating her benefits and denying her two mandatory appeals, defendant Aetna selectively considered the medical evidence and relied

1

on erroneous peer reviews instead of the opinions of her treating providers; (2) defendant Aetna failed to consider the Social Security Administration's 2009 determination that she is disabled; (3) defendant Aetna failed to identify what type of occupation she could perform or conduct any occupational analysis in support of its decision; (4) defendant Kraft failed to consider her voluntary appeal as it was required to do under the terms of the Plan; and (5) defendant Kraft had a conflict of interest that caused it to act in an arbitrary and capricious manner with respect to her voluntary appeal.  Defendants argue that  (1) they are entitled to summary judgment because they reviewed plaintiff's claim fully and fairly and had a rational basis for finding that she did not have a functional impairment that prevented her from working in any occupation during the relevant period; (2) plaintiff's voluntary appeal is not part of the administrative claim review process under ERISA and therefore not subject to review by this court; and (3) defendants are entitled to an award of attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and Fed. R. Civ. P. 54(d)(2)(B).

For the reasons stated below, I find that defendant Aetna did not act arbitrarily and capriciously in terminating plaintiff's benefits and that plaintiff has not raised a valid challenge to defendant Kraft's decision not to consider her voluntary appeal.  Accordingly, I am granting defendants' motion for summary judgment with respect to plaintiff's claim that defendants violated 29 U.S.C. § 1132(a)(1)(B).  I am denying plaintiff's motion for summary judgment in its entirety.  Because defendants did not develop an argument with respect to their request for attorney fees and costs, I will deny their request without prejudice to their filing a motion that meets the requirements of Fed. R. Civ. P. 54(d)

2

In their motion to strike, defendants assert that paragraph 3 of the Covington declaration, dkt. #56, contains information related to a January 27, 2015 telephone conversation between plaintiff's counsel, Brianna Covington, and an Aetna representative about plaintiff's voluntary appeal that is not part of the administrative record and cannot be considered by the court.  Because I agree that the voluntary appeal is not subject to review, I will grant defendants' motion to strike these statements. Defendants also have moved to strike paragraph 4 of the declaration and exhibit #1 to the declaration on the ground that they contain information about which Covington lacks personal knowledge. Because plaintiff does not object to defendants' challenges, I will grant the motion to strike those provisions of dkt. #56.

From the parties' proposed findings of fact and the administrative record (AR), I find the following facts to be undisputed.  Except in a few limited instances to provide context, I have not included facts related to plaintiff's voluntary appeal or the medical treatment that she received after Aetna completed its final review of her second mandatory review because Kraft's decision not to consider plaintiff's voluntary appeal is not subject to the court's review in this case.

UNDISPUTED FACTS

A.  Background

Plaintiff Kathy Jacowski is an adult resident of Almond, Wisconsin.  She began working for defendant Kraft Heinz Foods Company on October 5, 1981.  Most recently, she

worked as a customer service supervisor, a position that required strong and effective presentation skills, strong organizational skills, exceptional time management skills, effective negotiating skills, an ability to manage multiple priorities effectively, an ability to deal with ambiguity and unknowns, an ability to excel within a team environment, strong written and verbal communication skills, an ability to look for creative solutions to business issues, an ability to utilize technology to work smarter and improve the level of service to consultants and an ability to understand and comprehend complex procedures. Dkt. #31-5 at 12-13. Plaintiff stopped working on July 7, 2008, claiming she had mental health symptoms that prevented her from working.

Defendant Kraft is a global food and beverages company that sponsors defendant Kraft Foods Group, Inc. Employee-Paid Group Benefits Plan, a welfare benefit plan, for its employees.  The Plan is self-insured and funded by participating employee contributions. Defendant Kraft's Administrative Committee is the "plan administrator," and Kraft contracted with defendant Aetna Life Insurance Company to serve as the "disability claims administrator."  As disability claims administrator, Aetna provides claims management services, including determining qualification for benefits and disability claim duration. Aetna is responsible for all administration and payment of long-term disability claims and has full fiduciary authority with respect to any benefit determination.

As a Kraft employee, plaintiff received short-term and long-term disability insurance as a benefit under the Plan.  When she stopped working in 2008, she applied for and received 25 weeks of short-term disability benefits because her mental health problems left

her unable to work.  On or around December 18, 2008, defendant Aetna approved plaintiff's claim for long-term disability, which became effective on January 8, 2009.  On May 16, 2009, the Social Security Administration approved plaintiff's claim for Social Security Disability Insurance benefits at a monthly rate of $1,992.00, retroactive to January 2009.

In a letter dated January 3, 2011, Aetna notified plaintiff that it had determined that she met the definition of being "totally disabled from any gainful occupation" after receiving 30 months of benefits.  Dkt. #31-4 at 98.  In addition, Aetna advised plaintiff in the letter that "[a]ccording to the plan requirements, you will continue to receive LTD benefits as long as you continue to meet the Plan definition and remain under the regular care of a licensed physician that is appropriate for your condition.  We will continue to monitor your disability status by periodically requesting updated medical and/or other documentation to verify your continued eligibility for Long-Term Disability benefits."  Id. Plaintiff continued to receive long-term disability benefits under the Plan until Aetna terminated her benefits effective February 28, 2014.

## B.  Terms of the Plan

The Plan's "summary plan description" explains who is eligible for benefits and when coverage begins and ends.  With respect to benefits, the summary plan description states the following:

**LTD Benefits Provided by the Disability Plan**
You are eligible to receive [short-term disability] STD benefits for the first 26 weeks of disability due to an injury or sickness. If you have enrolled in the [long-term disability] LTD Plan, LTD benefits begin after you have been

disabled for 26 weeks and are approved by the DCA [disability claims administrator].

Dkt. #31 at 11.  After twenty-six weeks of disability, the Plan provides a monthly long-term disability benefit of 60 percent of the insured's pre-disability earnings.  Because plaintiff's monthly pre-disability earnings were $5,775.00, her monthly benefit was $3,465 after 26 weeks.

The summary plan description also contains the following relevant provisions and definitions:

**Long-Term Disability**

. . . You must apply for Social Security disability benefits. In addition, you must exhaust your appeal process with the Social Security Administration through the "Administrative Law Judge" level of appeal. However, you need not be receiving Social Security disability benefits to receive LTD benefits. The disability claims administrator can help you with the Social Security application process.

Dkt. #31 at 12.

**Definitions of Disability**
To be eligible for STD or LTD benefits, the DCA must determine that you satisfy the applicable definition of disability, as described below:

**Total Disability**
***For the First 30 Months (six months of STD plus the first 24 months of LTD) of Disability***
For the first 30 months of a disability period, you will be considered totally disabled if, due to a physical or mental impairment caused by injury or sickness:
• You are continuously unable to perform the **material and substantial duties** of your **own occupation**
AND
• You are not **gainfully employed**. The DCA makes an evaluation to determine whether an employee is or could be gainfully employed. Kraft and/or its disability claims administrator further reserves the right to

6

modify such determination of gainful employment in the future, based on objective medical finding

AND

- You are receiving **appropriate and regular care for your condition** from a doctor whose specialty or expertise is the most appropriate for your disabling condition(s) according to **generally accepted medical practice**. The care provided to you should be of demonstrable medical value for your disabling condition(s) and should continue until **maximum medical improvement** (MMI) is achieved and thereafter as is appropriate. You may be required by Kraft and/or its disability claims administrator to be under the care of a physician with expertise in treating your condition. For example, those disabled due to a psychiatric condition are expected to be under the care of a psychiatrist.

### *After 30 Months of Disability*

After you have received disability benefits under the plans for 30 months, (the initial six months of STD benefits followed by 24 months of LTD benefits) you will be considered totally disabled if, due to a physical or mental impairment caused by an injury or sickness:

- You are continuously unable to engage in **any occupation** that provides you with a salary of at least 60% of your pre-disability earnings, and exists within your geographical area

AND

- You are not gainfully employed, except as approved by Kraft and/or the DCA under partial disability or rehabilitative employment as outlined in the next section. If you do not meet this definition of total disability at the end of the 30-month period, your LTD benefits will stop.

Dkt. #31 at 14 (emphases in original). The Plan defines "any occupation" as "any job for which you are qualified by education, training or experience, or become qualified by education, training or experience." Id. at 6. "Sickness – means illness or injury causing a disability that occurs while your coverage under the plans is in effect." Id. at 7.

The Plan provides for two levels of appeal with the disability claims administrator (Aetna). After completing the second appeal, the claimant has exhausted the plan's administrative appeals process and may file a civil ERISA action in court. In addition, the

Plan provides for an additional voluntary appeal:

**Voluntary Appeal**

If you disagree with the DCA's decision to deny your appeal, you or your authorized representative can file a voluntary appeal with the Benefits Department of Kraft Foods Global, Inc. This appeal is optional; it is not required by the plan. The Benefits Department, acting on behalf of Kraft, as plan sponsor, retains discretion to decide whether to pay claims under this voluntary appeal process. Voluntary appeals should be filed within 90 days after receipt of the second level appeal denial by the DCA. The Benefits Department will give you a final decision on your appeal within 60 days after it is received. However, the Benefits Department may take up to an additional 60 days to review your claim. In this case, you will be notified of the extension ahead of time. You can submit a written request for a voluntary appeal to:

Kraft Foods Global, Inc. Benefits Department Three Lakes Drive
Northfield, Illinois 60093

**Discretionary Authority of Plan Administrator**

The plan administrator has complete discretionary authority to interpret and construe the terms of the plan and to decide factual and other questions relating to the plan and plan benefits, including, without limitation, eligibility for, entitlement to and payment of benefits, to the extent such authority has not been allocated to a disability claims administrator. Under the terms of the plan, the disability claims administrator has been allocated full discretionary authority over benefit determinations. See <u>Claims Administrator</u> for the name and address of the claims administrator. Benefits under the plans will be paid only if the plan administrator or the claims administrator decides in its discretion that under the terms of the plan the applicant is entitled to the benefit.

Dkt. #31 at 25.  The Plan contains a nearly identical provision to this on the following page,

except that the later provision refers to "claims administrators" instead of "disability claims

administrators":

**Plan Administrator**

The plan administrator has complete discretionary authority to interpret and construe the terms of the plan and to decide factual and other questions relating to the plan and plan benefits, including, without limitation, eligibility

8

for, entitlement to and payment of benefits, to the extent such authority has not been allocated to a **claims administrator**. Under the terms of the plan, **each claims administrator** has been allocated full discretionary authority over benefit determinations. See <u>Claims Administrator</u> for the name and address of the claims administrator. Benefits under the plans will be paid only if the plan administrator or the claims administrator decides in its discretion that under the terms of the plan the applicant is entitled to the benefit.

Dkt. #31 at 26 (emphasis added).


### C.   Plaintiff's Claim and Relevant Medical Records

### 1.   Dr. Robinson

In August 2007, Dr. David Robinson diagnosed moderate to severe major depression in plaintiff. He later noted that she also suffered from anxiety, post traumatic stress disorder and panic attacks. Plaintiff saw Dr. Robinson over the next several years for these conditions. In progress notes dated July 17, 2013 and August 7, 2013, Dr. Robinson noted that plaintiff complained of increased symptoms of depression and anxiety caused by marital, family, work and health problems. On August 26, 2013, Dr. Robinson wrote in a progress note that "patient presents with depressive symptoms that remain stable and anxiety symptoms that remain stable" and that she "reported a decrease in symptoms since her last session" and "is less angry and depressed recently, to a large extent because her anxiety about her father has diminished." Dkt. #31-8 at 81.

Dr. Robinson died in September 2013. Plaintiff later reported feeling devastated and having a hard time with the transition to a new provider.

2.  Social worker Vonck

Plaintiff began seeing Breanna Vonck, a licensed clinical social worker, soon after Dr. Robinson's death.  On September 30, 2013, Vonck noted that plaintiff presented with a depressed mood and ongoing symptoms of anxiety and relationship stress.  At that time, plaintiff said that her symptoms had increased.  Plaintiff also asked Vonck to complete paperwork for her long-term disability claim but Vonck noted that she might not be the most appropriate person because at that point, she had met with plaintiff only once.

Vonck completed two "Behavioral Health Clinician Statement – Update" forms in support of plaintiff's claim.  On a form dated October 11, 2013, Vonck noted that plaintiff was "tearful and upset due to loss of previous clinician, reports an increase in depressive symptoms."  Dkt. #31-8 at 89.  In response to questions about plaintiff's ability to work and return to work status, she wrote that she was not able to answer because she had met with plaintiff only once.  Id.  Vonck also noted that she had not yet assessed many areas related to plaintiff's cognitive functioning or activities of daily living and that plaintiff had not reported having panic attacks in their one meeting.  She assigned plaintiff a global assessment of functioning score of 55 but did not explain what this meant.

On a form dated November 25, 2013, Vonck noted that plaintiff could follow a three-step command, did not have any memory deficits or problems focusing or concentrating the their session, did not exhibit hallucinations and showed impaired decision making only by gambling in recent weeks.  With respect to emotional functioning, Vonck stated that plaintiff exhibited an irritable affect and fidgeting and reported having a high level of anxiety

in public settings that resulted in her heart racing and her wanting to leave the situation. Plaintiff also exhibited a limited energy level and reported that she felt secure only at home and that it took her more time than it should to complete tasks. Vonck stated generally that plaintiff's "level of functioning at this time would limit her ability to perform a job effectively [and] efficiently." AR, dkt. #31-8, at 62-63.

### 3. Dr. Matthew

On March 27, 2014, after the termination of her long-term disability benefits, plaintiff began seeing Dr. Ronald Matthew, a psychologist. At that visit, plaintiff reported the following:

- After working for 31 years at Kraft, she became severely depressed. It got worse because she started having nightmares and flashbacks about her childhood sexual molestation.

- Her anxiety got so bad that she did not want to get out of bed or leave the house. When she did leave the house, she had "horrific" anxiety attacks, which she still gets.

- She "crashed" after Dr. Robinson died, feeling devastated and abandoned. Although she started seeing Vonck, whom she thought was a doctor, Vonck was not helpful to her.

- Aetna informed her a week ago that she would no longer be getting benefits.

Upon examination, Dr. Matthew noted that plaintiff's attention and concentration were clinically intact but that her prognosis for treatment was only fair. He gave her a global assessment of functioning score of 50. Dr. Matthew diagnosed recurrent major depressive disorder, post traumatic stress disorder and social environment, occupational and economic

11

problems.

Following the March 2014 examination, Dr. Matthew completed a Behavior Health Clinician Statement for Aetna, dated April 10, 2014.  He noted on the form that although he did not observe plaintiff having a panic attack, she reported having them "daily" and "out of the blue" "several times a week."  AR, dkt. #31-9, at 35-36.  He also checked boxes stating that plaintiff could not perform "any reasonable occupation" and was "unable to work currently."  AR, dkt. #31-9, at 35-37. Dr. Matthew wrote that "concentration disrupted by emotional flooding, sadness.  Daily panic attacks, some paranoia over husband's activities." AR, dkt. #31-9, at 36.  He also noted that he observed the following during his examination of plaintiff:  "crying, anger (words, volumn [sic] & intensity), disgusted looks, sarcasm."  Id.  Dr. Matthew noted that plaintiff reported some suicidal thoughts but had no plan and exhibited normal reasoning and judgment.

In a letter to Aetna dated July 15, 2014, Dr. Matthew stated that he had completed a Detailed Assessment of Post-Traumatic Stress (DAPS) of plaintiff and the results confirmed that she had post traumatic stress disorder.  AR, dkt. #31-7, at 81-82.  He noted that plaintiff continued to experience intrusive flashbacks to childhood sexual abuse, nightmares, panic attacks, hyper arousal, trouble concentrating, avoidance and peritraumatic distress (guilt, shame, helplessness and suppressed rage) on a daily basis.  Dr. Matthew stated his opinion that plaintiff was unable to work at gainful employment because she was unable to sustain productive effort for more than several hours in a row for multiple days in a row. Although plaintiff was taking medication, she reported that it did not always help and that

12

she suffered panic attacks whenever she left the house.

4.  Plaintiff's letters to Aetna

In a letter dated June 22, 2014, plaintiff described herself as a hermit who does not drive, go grocery shopping, get gas, go to the pharmacy, do housework, do laundry, make meals or do the dishes. She stated that as of the date of her appeal letter, she had not showered, washed her face or brushed her teeth in more than a month. She did not watch television because it might trigger her flashbacks and anxiety attacks. Plaintiff reiterated many of these symptoms in her July 2, 2014 and July 8, 2014 letters to Aetna. In her July 8, 2014 letter, plaintiff stated that she was unable to focus on any one thing, lost her train of thought quickly and was restless.

5.  Dr. Benn

In a letter to Aetna dated July 13, 2014, Dr. William Benn wrote that plaintiff was "receiving an optimum combination of mental health counseling and medications, but she is still clearly disabled, and unable to function in any job outside of her home." AR, dkt. #31-7, 67-68. He stated that plaintiff reported feeling safe and most comfortable at home and that any conflict with her supervisors, coworkers or customers would be very destabilizing for her. He reported that her anxiety attacks were disabling and required her to take Alprazolam before leaving the house, and that doing so sometimes caused her to fall asleep. Dr. Benn also noted that plaintiff took potent narcotics for management of chronic

neck pain and slept only two to three hours a night because of nightmares.  Dr. Benn was of the opinion that plaintiff's medication side effects and sleep deprivation would make her an unsafe driver.

### D.  Defendants' Evaluation of Plaintiff's Claim

On September 10, 2013, Aetna, as the claims administrator, called plaintiff for a long-term disability claimant interview.  Plaintiff informed Aetna that she had learned the day before that Dr. Robinson had died.  On September 23, 2013, Aetna contacted plaintiff to obtain the name of her new mental health provider who could verify the "specific deficits" related to her diagnosis.  AR, dkt. #31, at 45.  The next day, plaintiff informed Aetna that her new provider was Vonck.  In early October 2013, Aetna asked Vonck to complete a clinician statement and provide plaintiff's medical records.

Aetna performed a clinical review on October 30, 2013 and determined that the records from Vonck did not seem to support the fact that plaintiff had an ongoing disability.  On January 16, 2014, Aetna approved plaintiff's benefit claim through February 28, 2014 to allow time for a peer review.  Before reaching a final decision on plaintiff's claim, Aetna sought three peer reviews, which are summarized below.

### 1.  Dr. Schnur

On January 13, 2014, defendant Aetna asked Dr. Leonard Schnur to complete a physician review of plaintiff's claim and provide a description of her functional impairments

14

from July 1, 2013 through January 31, 2014.  Dr. Schnur reviewed plaintiff's medical records dating back to July 2013 and contacted Vonck for a peer-to-peer consultation.

In summarizing plaintiff's medical records in his January 20, 2014 report, Dr. Schnur wrote that following examinations on July 17 and August 17, 2013, Dr. Robinson had noted that plaintiff had increasing depression and anxiety symptoms, but that a little over a week later, Dr. Robinson stated in an August 26, 2013 note that plaintiff appeared "more stable" with her symptoms.  AR, dkt. #31-8, at 59.  Dr. Schnur reported that in an October 11, 2013 clinician statement, Vonck noted that plaintiff "does not have panic attacks."  Id.  He also reported that in a November 2013 clinician form, Vonck noted that plaintiff was able to follow a three-step command, did not present with memory deficits and did not exhibit an impairment in focus or concentration.

With respect to his January 13, 2014 telephone conversation with Vonck, Dr. Schnur reported that Vonck listed plaintiff's diagnoses as major depressive disorder and anxiety disorder and stated that post traumatic stress disorder  was not a "working diagnosis" for which plaintiff was being treated at that time.  AR, dkt. #31-8, at 60.  (Vonck noted that plaintiff's post traumatic stress disorder had been diagnosed six years earlier.)  Dr. Schnur also reported that "Vonck, when asked if there were any formal measurements of cognitive and emotional functioning to substantiate impairment that would preclude work capacity of any occupation, did not have any to report.  Ms. Vonck, however, indicated that she would refer to a psychologist for assessment."  Id.

Dr. Schnur concluded that "there was a lack of examination findings to substantiate

15

the presence of an ongoing functional impairment across cognitive, emotional and behavioral spheres" that would have precluded plaintiff from working from July 2013 through January 2014. Id. He noted that "[f]rom a psychological standpoint, [because] a functional impairment was not substantiated, no restrictions or limitations would be needed." AR, dkt. #31-8, at 61.

## 2. Dr. Gerson

Dr. Stephen Gerson, a psychiatrist, performed a peer review at Aetna's request on June 2, 2014. He reviewed Dr. Schnur's peer review, plaintiff's job description and plaintiff's 2013 and 2014 office visits with two psychologists, Dr. Robinson and Dr. Matthew, and social worker Vonck. Dr. Gerson wrote that although Dr. Matthew noted in March 2014 that plaintiff had panic attacks, he did not explain their "frequency and stimulus." AR, dkt. #31-8, at 61. He reported that during a May 30, 2014 telephone interview, Dr. Matthew "indicated on initial evaluation of 3/27/14 mental status did not reveal substantial abnormalities. The claimant presented as normal appearing with no substantial cognitive impairment, suicidality, psychomotor retardation. She was not disheveled or unkempt." AR, dkt. #31-8, at 47. Dr. Gerson also reported that Dr. Matthew stated the following:

- Plaintiff experienced flashbacks of prior sexual trauma that were triggered by problems with her husband and parents. (Her husband is an active alcoholic.)

- Plaintiff's primary care physician was treating her with medication but Dr. Matthew did not know if she was seeing a psychiatrist. Dr. Matthew did

16

not see it as his role to ask any questions about psychotropic medications
to either the primary care physician or to recommend a psychiatrist.

- Plaintiff could not work because she is unable to sustain consistent effort
and her family problems triggers regressions to her earlier sexual abuse.

- Plaintiff can drive a car, manage her own checkbook, read and understand
documents, cook, clean and do housework.

Dr. Gerson concluded that even though Dr. Matthew reported that plaintiff had some

level of anxiety and depression beginning on March 27, 2014, there was no evidence of

plaintiff's post traumatic stress disorder, such as frequent and acute flashbacks, severe

nightmares, "easy startability" and extreme anxiety with panic attacks.  He stated that her

mental status examinations were unremarkable; there was no evidence of her being

disheveled, unkempt, psychomotor retarded, cognitively impaired or unable to manage her

activities of daily living; and that she is able to drive a car, manage her checkbook, read,

shop, clean and intermittently take care of her mother on weekends.  He also noted that

plaintiff was not in active "psychopharm management," did not attend Al-Anon and had

minimal changes in her antidepressant regimen over the past three years.  AR, dkt. #31-8,

at 48.  Dr. Gerson also found it significant that plaintiff was not in couples' therapy, had no

plan to see a psychiatrist and no plan for her husband to get treatment for his alcoholism.

3.  Dr. Schroeder

Dr. Mark Schroeder, a psychiatrist, completed a peer review of plaintiff's claim for

Aetna on September 6, 2014.  He reviewed the peer reviews and plaintiff's recent letters,

medical records and job description and concluded that the available evidence was not sufficient to support a psychiatric functional impairment requiring work restrictions or limitations during the time period in question (March 1 to August 27, 2014). Although he noted that plaintiff had reported a number of psychiatric symptoms that she claimed prevented her from functioning, no clinical information corroborated the presence of such a severe impairment. Dr. Schroeder explained that

> A key question for this review is whether during the timeframe in question the evidence supports that the employee's psychiatric condition has been severe enough to rise to the level of functional impairment precluding occupational functioning; or rather if it has reflected a less-severe reaction to job and family stress.

*   *   *

> An individual's subjective tolerance of activities may not reliably reflect true capabilities, particularly when the individual is under stress, when there are family and job problems, and when disability benefits are at stake. Functional examination findings (as from mental status examinations, behavioral observations, or the results of psychological or neuropsychological testing with validity scales) are helpful in assessing how an individual's self-reported symptoms and difficulties relate to functional impairment.

AR, dkt. #31-7, at 38.

Dr. Schroeder reported that in March 2014, Dr. Matthew observed that plaintiff's mental status examination was intact and she was taking care of her mentally ill mother "even more now" and that in their teleconference Dr. Matthew described plaintiff as often appearing numb, tearful and expressionless but nothing more severe. Id. at 39. He noted that while Dr. Matthew stated in their teleconference that plaintiff tended to stay in her room and not do much, she also took care of her schizophrenic mother and father with

18

physical problems.  Dr. Schroeder wrote that he spoke only briefly with Dr. Benn, who stated that his information was taken from plaintiff's firsthand reports.  Dr. Benn declined to speak with Dr. Schroeder until he obtained consent from plaintiff but Dr. Benn never followed up.  Dr. Schroeder also cited portions of Dr. Gerson's findings related to plaintiff's daily activities and noted that during a teleconference with Dr. Gerson, Dr. Matthew reportedly stated that he did not believe that a psychiatrist or partial hospital program would help plaintiff.

Dr. Schroeder found that plaintiff's records "did not document more severe mental status findings such as marked disturbances of organization of thought, perception of reality, cognitive functioning, behavior, speech, motor functioning, or hygiene, which may reasonably reflect substantial psychiatric impairment."  AR, dkt. #31-7, at 39.  It was his opinion that a mental disorder severe enough to prevent the performance of work duties also would cause significant disruption in other life activities, but the record did not provide clear and consistent information about plaintiff's ability to function during the relevant time period.  Dr. Schroeder also wrote that "[t]he evidence suggests that employee may have an alternative motivation to remain out of work:  to avoid job problems and focus on family issues."  Id. at 38.

## E.  Termination of Benefits and Denial of Appeals

On March 21, 2014, Aetna verbally informed plaintiff that her claim was denied  on the basis of Dr. Schnur's peer review.  In a letter dated March 25, 2014, Aetna notified

plaintiff that it had determined that she no longer met the definition of disability under the

Plan and that her benefits were terminated effective February 28, 2014.  The letter provided

the following explanation for the decision:

> On January 13, 2014, Ms. Vonck stated in a teleconference with our Peer Reviewer that the case had been transferred to her on an interim basis in September 2013 due to Dr. Robinson's death. Ms. Vonck had reviewed your history of PTSD but indicated that is not a working diagnosis and that you were receiving treatment for PTSD at the current time. Ms. Vonck's diagnosis included major depressive disorder and anxiety disorder. Ms. Vonck, when asked if there were any formal measurements of cognitive and emotional functioning to substantiate impairment that would preclude work capacity of any occupation, did not have to report. Ms. Vonck, however, indicated that she would refer to a psychologist for assessment. Although the patient had been diagnosed with PTSD several years ago, according to Ms. Vonck, the diagnosis of PTSD is not currently a working diagnosis nor is the claimant receiving treatment for PTSD. As such, there did not appear to be any reported symptoms of dissociation, flashbacks, illusions or hallucinations.

> Based on the provided documentation, and telephonic consultation, when applicable, provide detailed description of the claimant's functional impairments, if any, from July 1, 2013 through January 31, 2014. Based upon the documentation submitted for review and the peer-to-peer consultation, there was a lack of examination findings to substantiate the presence of an ongoing functional impairment across cognitive, emotional, and behavioral spheres for the time period July 1, 2013 through January 31, 2014 which would preclude the claimant from performing the work of any occupation. The documentation submitted for review and the information obtained during the peer-to-peer with Ms. Vonck, although noting the presence of emotional distress marked by symptoms of depression and anxiety, did not however include any formal measurements of cognitive and emotional functioning to accurately substantiate the presence of an ongoing functional impairment. Should additional examination findings be submitted, an addendum can be completed at a later date.

AR, dkt. #31-5, at 60.  Plaintiff appealed this determination as she was entitled to do under

the Plan and informed Aetna that she would be seeing Dr. Matthew.  Aetna placed its appeal

review on hold until April 21, 2014 pending plaintiff's submission of additional documents.

On June 12, 2014, Aetna denied plaintiff's appeal and affirmed its denial of plaintiff's

claim for long-term disability benefits, explaining in relevant part that

> [Y]our LTD benefits were terminated effective March 01, 2014 as the medical information from your treating providers did not support a functional impairment that would have prevented you from engaging in any occupation.
> . . .
>
>                 \*     \*     \*
>
> A progress note from Dr. Robinson dated July 17, 2013, noted you had depressive anxiety. Discussion of events were around your father who was gravely ill. A subsequent note dated August 07, 2013 noted you experienced parent/child difficulties and marital problems. A progress note dated August 26, 2013, noted you were seen in a follow-up appointment for depression. It was noted your father's health had improved.
>
> Ms. Vonak [sic] completed a Behavioral Health Clinician Statement form on November 25, 2013. Cognitive functioning was intact and you were able to drive to appointment.
>
> A progress note from Ms. Vonak dated April 02, 2014, noted your mother had back surgery, and you had to take care of her. You reported having trouble getting out of bed concentrating. It was noted you performed laundry at your household.
>
> Dr. Mathew [sic] completed a Behavioral Health Clinician Statement on April 10, 2014. Diagnos[is] listed was major depression. It was noted you experienced panic attacks, however, frequency or duration of these were not documented. Cognitive functioning was intact. It was noted you were able to maintain your residence, do routine shopping, pay bills and operate a motor vehicle. Although there is notation of presence of emotional distress marked by symptoms of depression and anxiety, the information provided does not contain any formal measurements of cognitive or emotional functioning to substantiate an ongoing impairment that would prevent you from performing work at any reasonable occupation.
>
> To further assess your medical conditions, the independent physician reviewer conducted a peer-to-peer conference call with Dr. Mathew on May 30, 2014. Dr. Mathew repor[t]ed that on initial evaluation in March of 2014, there were no substantial abnormalities. There were no cognitive impairment, or

> psychomotor retardation. In addition, the independent physician reviewer attempted a peer-to-peer conference call with Ms. Vonak, but this was unsuccessful.

AR, dkt. #31-5, at 83.  Plaintiff again appealed the termination of her benefits.

In a letter dated October 15, 2014, Aetna affirmed its denial of plaintiff's claim for a second time, finding "a lack of medical evidence (i.e. formal mental status examination findings, performance based test of psychological functioning with standardized scores, behavioral observations with frequency, duration, and intensity of symptoms observed, etc.) supporting a functional impairment that would have prevented you from engaging in any occupation."  AR, dkt. #31-5, at 98.  In the letter, Aetna repeated the same medical history that it had recounted in its denial of plaintiff's first appeal and added the following explanation:

> In an initial evaluation from Dr. Matthew dated March 27, 2014, he noted your reports of becoming extremely depressed with nightmares and flashbacks based on previous abuse, such that you did not want to leave the house or do anything. Dr. Matthew noted you reported feeling depressed, but the observed mental status examination was intact. He diagnosed you with recurrent major depressive disorder and PTSD.
>
> Dr. Mathew [sic] completed a Behavioral Health Clinician Statement on April 10, 2014. Diagnosis listed was major depression. It was noted you experienced panic attacks, however, frequency or duration of these were not documented. Cognitive functioning was intact. It was noted you were able to maintain your residence, do routine shopping, pay bills and operate a motor vehicle. Although there is notation of presence of emotional distress marked by symptoms of depression and anxiety, the information provided does not contain any formal measurements of cognitive or emotional functioning to substantiate an ongoing impairment that would prevent you from engaging in any occupation.
>
> A progress note from Dr. Matthew dated May 29, 2014, noted you reported family stressors about which you felt depressed.

22

In a letter dated July 15, 2014, Dr. Matthew stated he diagnosed you with recurrent major depressive disorder and PTSD. The provider stated that he has administered the Detailed Assessment of Posttraumatic Stress which showed a valid profile and affirms the diagnosis of PTSD related to childhood abuse. Dr. Mathew [sic] stated that these PTSD symptoms continue with intrusive flashbacks, nightmares, panic attacks, hyperarousal, trouble concentrating; feelings of guilt, shame, helplessness, trust issues, and suppressed rage; and difficulty sustaining effort. Dr. Mathew further noted you take Xanax and Cymbalta, and that you predictably get panic attacks when you leave your home. Again, this information does not support impairment. Dr. Mathew concluded that you cannot sustain gainful employment, and that your symptoms have been chronic and persistent and therefore you are unable to work. Again, this information does not support an impairment that would prevent you from working. There is no indication of the frequency, or duration of symptoms observed and how these symptoms would interfere with your ability to work.

A letter from Dr. Benn dated July 2014 was reviewed. In this letter, Dr. Benn noted that your PTSD relates to abuse by your father and the occurrence of flashbacks impact all aspects of your life. You did not want to go to bed because of frequent nightmares and you only get 2-3 hours of sound sleep per night. Because of your poor sleep, you have constant exhaustion, and don't have the energy to do anything during the day. Dr. Benn, added that anxiety attacks are disabling, and you must take Alprazolam before leaving the house. He indicated you were still clearly disabled, and unable to function in any job outside of your home.

To further assess your medical condition, the independent physician reviewer conducted a peer-to-peer conference call with Dr. Mathew on September 04, 2014. Dr. Mathew indicated he began seeing you [i]n March of 2014. At that time, you had experienced a significant and continuous level of impairment in emotional functioning which affected your relationships.  He confirmed your medication management was handled by Dr. Benn.

Id. at 97-98.  The letter also advised plaintiff that she had the option to file a voluntary appeal but that she already had exhausted her administrative remedies and had the right to file a civil action within one year.

All three of Aetna's denial letters stated the following with respect to plaintiff's

previous award of social security benefits:

> We understand that you have recently been approved for Social Security
> Disability (SSD) benefits. However, our disability determination and the SSD
> determination are made independently and are not always the same. The
> difference between our determination and the SSD determination may be
> driven by the Social Security Administration (SSA) regulations. For example,
> SSA regulations require that certain disease/diagnoses or certain education or
> age levels be given heavier or even controlling weight in determining whether
> an individual is entitled to SSD benefits. Or, it may be driven by the fact that
> we have information that is different from what SSA considered. We have not
> been provided with the basis for the SSD determination, and the evidence that
> was relied on for the SSD determination has not been identified to us.
> Therefore, even though you are receiving SSD benefits, we are unable to give
> it significant weight in our determination and we find that you are not (or you
> are no longer) eligible for LTD benefits under the Disability Plan.

Id. at 60, 83-84 and 98.

Plaintiff filed a voluntary appeal under the Plan in January 2015.  In a letter dated
January 30, 2015, Kraft acknowledged its receipt of plaintiff's appeal and stated that it would
be under review for the next 60 days.  On February 24, 2015, Kraft stated that it had
reviewed plaintiff's request for a voluntary appeal and found that it was not eligible for the
voluntary settlor appeal process because it did not involve a summary plan description
provision.   According to the letter, "[c]laims denied by Aetna based on a clinical
determination regarding medical necessity. . . are not eligible for the voluntary appeal
process."  AR, dkt. #35-1 at 19.  On March 9 and 10, 2014, within 60 days of the initial
letter from Kraft acknowledging the notice of intent to file a voluntary appeal, plaintiff filed
an appeal letter and supporting medical records, even though Kraft already had declined to
consider the voluntary appeal.  Some of the medical records that plaintiff submitted post-
dated Aetna's final decision on her claim.

24

OPINION

Under ERISA, a plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). When a court reviews a denial of benefits under an insurance policy governed by ERISA, the denial must be reviewed under the de novo standard unless the plan has given the plan administrator or fiduciary discretionary authority to determine benefits or construe the terms of the plan. Williams v. Aetna Life Insurance Company, 509 F.3d 317, 321 (7th Cir. 2007) (quoting Firestone Tire and Rubber v. Bruch, 489 U.S. 101, 115 (1989)). The parties agree that the arbitrary and capricious standard of review applies in this case because the Plan grants discretionary authority to Aetna to make all benefits determinations.

The "arbitrary and capricious standard is the least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan." Semien v. Life Insurance Co. of North America, 436 F.3d 805, 812 (7th Cir. 2006) (quoting Trombetta v. Cragin Federal Bank for Savings Employee Stock Ownership Plan, 102 F.3d 1435, 1438 (7th Cir. 1996)).

> Despite the deferential nature of this standard however, it "is not a rubber stamp" and a denial of benefits will not be upheld "when there is an absence of reasoning in the record to support it." Therefore, this court will uphold the Plan's determination "as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem."

25

Williams, 509 F.3d at 321-22 (quoting Hackett v. Xerox Corporation Long Term Disability Income Plan, 315 F.3d 771, 773 (7th Cir. 2003); Sisto v. Ameritech Sickness & Accident Disability Benefit Plan, 429 F.3d 698, 700 (7th Cir. 2005)).

In addition to these substantive requirements, ERISA requires that in denying a claim, the claims administrator communicate the "specific reasons" for the denial to the claimant and afford the claimant an opportunity for a "full and fair review." 29 U.S.C. § 1133; Hackett, 315 F.3d at 775 (internal citation omitted); Schilling v. Epic Life Insurance Co., 2015 WL 856575, at *12 (W.D. Wis. Feb. 27, 2015) (noting same procedural requirements). Substantial compliance with these two requirements is sufficient to satisfy ERISA. Hackett, 315 F.3d at 775; Schilling, 2015 WL 856575, at *12. For example, even though the plan administrator must give the applicant the reason for the denial, it "does not have to explain to him why it is a good reason." Gallo v. Amoco Corp., 102 F.3d 918, 923 (7th Cir.1996) ("To require that would turn plan administrators not just into arbitrators . . . but into judges.").

The scope of the court's review is limited to the record the plan administrator had before it at the time that the benefits determination was made. Donato v. Metropolitan Life Insurance Co., 19 F.3d 375, 380 (7th Cir. 1994); Smart v. State Farm Ins. Co., 868 F.2d 929, 936 (7th Cir. 1989). (As discussed below, there is a dispute about whether Kraft's refusal to consider the voluntary appeal that plaintiff filed in 2015 should be subject to review by this court.)

Plaintiff argues that the termination of her long-term disability benefits in 2014 was

arbitrary and capricious for several reasons that I will address separately below.

A. <u>Consideration of Medical Evidence</u>

After learning of Dr. Robinson's death, Aetna sought updated information from plaintiff's new providers on the status of her condition and ability to work.  It was entitled to do this under the terms of the Plan.  Aetna performed a clinical review of plaintiff's claim on October 30, 2013, and determined that the records from plaintiff's current therapist, Vonck, did not seem to support the fact that plaintiff had an ongoing disability.  In light of its concerns, Aetna sought three different peer reviews over the course of the next year.  Aetna then relied on the conclusions of the reviewing physicians in terminating plaintiff's benefits in March 2014 and denying her mandatory appeals in June and October 2014. Plaintiff challenges all three determinations, asserting that Aetna ignored the continuous and severe nature of her symptoms, improperly adopted the opinions of the reviewing physicians over those of her treating providers, "cherry picked" the evidence that favored the termination decision and relied on inaccurate characterizations of the medical evidence.

As an initial matter I note that plaintiff devotes a large portion of her opening summary judgment brief to summarizing her diagnoses and symptoms that first led to her award of benefits in 2008.  To the extent that she is arguing that her benefits should have continued because Aetna found that she was disabled under the terms of the plan for more than five years, the argument fails because that fact alone does not mean that Aetna acted arbitrarily and capriciously.  ERISA does not prohibit a plan administrator from performing

27

a periodic review of a beneficiary's disability status, <u>Holmstrom v. Metropolitan Life Insurance Co.</u>, 615 F.3d 758, 767 (7th Cir. 2010), and paying benefits does not "operate[] forever as an estoppel so that an insurer can never change its mind." <u>Leger v. Tribune Co. Long Term Disability Benefit Plan</u>, 557 F.3d 823, 832 (7th Cir. 2009) (internal quotation omitted).  "A plan administrator is entitled to seek and consider new information and, in appropriate cases, to change its mind." <u>Holmstrom</u>, 615 F.3d at 767.  Further, although the plan administrator must explain why it reached a different decision, <u>Hackett</u>, 315 F.3d at 775, it does not have to prove that plaintiff's condition had actually improved.  <u>Holmstrom</u>, 615 F.3d at 767.  The Court of Appeals for the Seventh Circuit has made clear that the "previous payment of benefits is just one . . . factor, to be considered in the court's review process; it does not create a presumptive burden for the plan to overcome." <u>Id.</u>

Plaintiff also seems to assume that Aetna and the reviewing physicians owed deference to the opinions of her treating providers.  However, under ERISA, a treating physician's opinion is entitled to no more deference than the opinion of a reviewing physician hired by the plan.  "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003).  <u>See also Holmstrom</u>, 615 F.3d at 774 (reciting same standard).  The fact that Aetna relied on the opinions of reviewing physicians who did not personally examine plaintiff also does not suggest an arbitrary and capricious decision.  Aetna's decision to "seek

28

independent expert advice" is reasonable and "evidence of a thorough investigation." Davis, 444 F.3d at 575.  There also is no prohibition on "the commonplace practice of doctors arriving at professional opinions after reviewing medical files."  Id. at 577 ("[D]octors are fully able to evaluate medical information, balance the objective data against the subjective opinions of the treating physicians, and render an expert opinion without direct consultation.").

I turn next to plaintiff's specific criticisms of Aetna's denials and the reviewing physician reports.

1.  Initial denial

In its March 25, 2014 denial letter, Aetna summarized most of Dr. Schnur's report verbatim and stated that it was denying plaintiff benefits because of a "lack of examination findings to substantiate the presence of an ongoing functional impairment across cognitive, emotional, and behavioral spheres for the time period July 1, 2013 through January 31, 2014."  There is rational support in the record for this decision.  As noted by both Aetna and Dr. Schnur, Vonck stated that there were no formal measures of plaintiff's abilities or specific limitations, that she would have to refer plaintiff to a psychiatrist for assessment and that plaintiff did not have a current working diagnosis of post traumatic stress disorder.

Plaintiff argues that Aetna failed to address Dr. Robinson's or Vonck's 2013 progress notes discussing her irritability, fidgeting, lack of energy and unwillingness to leave home in the denial letter, but Dr. Schnur considered all of these reports.  Contrary to plaintiff's

suggestion, there is no requirement that Aetna summarize all of plaintiff's medical records in its denial letter as long as it did not ignore substantial evidence in plaintiff's favor. Majeski, 590 F.3d at 484 (plan administrators do not have to "annotate every paragraph of a thousand-page medical record"). Aetna made clear in its all of its denial letters that it was relying on the findings of the physicians who had reviewed plaintiff's records and statements and concluded that they did not support the finding of a functional impairment. Love v. National City Corp. Welfare Benefits Plan, 574 F.3d 392, 397 (7th Cir. 2009) (analyzing findings of physician retained by plan to review claim file); Davis, 444 F.3d at 577-78 (plan administrators entitled to rely on opinions of in house physicians). Accordingly, the fact that Aetna did not discuss a particular symptom that plaintiff believes is favorable does not mean it was not considered.

Citing Vonck's notation in her November 25, 2013 clinician assessment that plaintiff experiences a "high degree of anxiety when outside her home," plaintiff asserts that Aetna and Dr. Schnur wrongly stated that plaintiff did not appear to have any dissociation, flashbacks, illusions or hallucinations. Although plaintiff may believe that the anxiety Vonck described qualified as "dissociation, flashbacks, illusions or hallucinations," Vonck did not make this clear. In fact, she checked "no" in response to a question on the same form about plaintiff having delusional ideations or hallucinations.   AR, dkt. #31-8, at 62.

Similarly, plaintiff criticizes Dr. Schnur for writing that Vonck reported that plaintiff did not have panic attacks when in fact Vonck stated that plaintiff had not reported them. This is a very minor point. Any error in Dr. Schnur's characterization of Vonck's statement

30

is not significant and does not render his report unreliable, especially in light of the fact that Vonck told Dr. Schnur that plaintiff's post traumatic stress disorder diagnosis was six years old and had not yet been confirmed as current.  In addition, at her last visit with Dr. Robinson on August 26, 2013, plaintiff reported that her symptoms had decreased and she was feeling less angry and depressed.

Plaintiff also asserts that Dr. Schnur, and presumably Aetna, should have deferred to Vonck's general notes that plaintiff reported increased symptoms of anxiety and depression again in the fall of 2013.  However, apart from making general statements that plaintiff could not work and that tasks took plaintiff longer than they should have, Vonck did not assess any functional limitations or otherwise document how plaintiff's symptoms of anxiety and depression affected her ability to function in a work setting.  Plaintiff points out that Vonck assigned her a global assessment of functioning score of 55 in October 2013, but Vonck did not explain how she reached this conclusion or what it meant in terms of plaintiff's specific functioning.  Further, with respect to plaintiff's cognitive functioning, Vonck noted in November 2013 that plaintiff could follow a three-step command, did not have any memory deficits or problems focusing or concentrating the their session and showed impaired decision making only by gambling in recent weeks.  Accordingly, Dr. Schnur had a rational basis for disagreeing with Vonck's assessment concerning plaintiff's ability to work.

"[T]he deferential standard of review requires that we accept '[the administrator's] choice between competing medical opinions so long as it is rationally supported by record evidence.'"  Becker v. Chrysler LLC Health Care Benefits Plan, 691 F.3d 879, 889 (7th Cir.

31

2012) (citing Black v. Long Term Disability Insurance, 582 F.3d 738, 745 (7th Cir. 2009)).

Here, there is sufficient evidence to support Aetna's March 2014 decision.

2. Denial of first appeal

Following the initial denial of her benefits, plaintiff sought treatment from Dr. Matthew, who met with her on March 27, 2014 and completed a clinician form on April 10, 2014, before Aetna reviewed plaintiff's appeal.  In evaluating plaintiff's appeal for Aetna, Dr. Gerson considered Dr. Schnur's report and the records he reviewed and the new information provided by Dr. Matthew.  In its June 14, 2014 denial letter, Aetna relied on Dr. Gerson's report in identifying the following reasons for not overturning its previous decision:

- Although Dr. Matthew referred to plaintiff's panic attacks, he did not document their frequency or duration.

- Dr. Matthew stated that plaintiff did not have "substantial abnormalities," cognitive impairment or psychomotor retardation.

- Dr. Matthew noted that plaintiff was able to maintain her residence, do routine shopping, pay bills and operate a motor vehicle.

- Although plaintiff had symptoms of depression and anxiety, the information provided did not contain any formal measurements of her cognitive or emotional functioning to substantiate an ongoing impairment.

These reasons are well-founded and rationally supported by the March and April 2014 opinions of Dr. Matthew summarized in the fact section above.

Plaintiff argues that Dr. Gerson's report contains numerous typographical errors and misrepresentations of Dr. Matthew's opinions, showing that Dr. Gerson did not complete a thorough review of her file.  However, I am not convinced that the report was so flawed as

to qualify as an arbitrary and capricious review.

Plaintiff points out that Dr. Gerson misspelled the names of her treating providers, incorrectly wrote that Dr. Matthew's March report was dated "2010" instead of "2014" and characterized Dr. Matthew's notation that plaintiff had some suicidal thoughts but no suicide plan as a "lack of suicidality." However, none of these points show that Dr. Gerson missed important evidence, interpreted it incorrectly or otherwise reached unreliable conclusions.

Plaintiff also criticizes Dr. Gerson and Aetna for relying on Dr. Matthew's May 2014 statement that plaintiff had "no substantial abnormalities," because during plaintiff's voluntary appeal to Kraft in 2015, Dr. Matthew made it clear that he was referring to the absence of psychotic symptoms. However, Dr. Matthew's explanation was not part of the record that Aetna considered, and as discussed later in this opinion, the voluntary appeal is not subject to review in this case.

Plaintiff's primary challenge to Dr. Gerson's report and Aetna's June 2014 denial letter is that they mischaracterized and ignored evidence of her panic attacks and disabling symptoms. She asserts that Dr. Gerson erred in stating that Dr. Matthew did not explain the "frequency and stimulus" of her panic attacks is incorrect because Dr. Matthew noted that plaintiff reported having panic attacks both daily and several times a week. However, Dr. Matthew made only a brief notation on the clinician form and did not discuss plaintiff's panic attacks in any detail. Because there was no information on the form about the duration of the attacks or what caused them, I do not find that Dr. Gerson's summary was so inaccurate as to be unreliable.

33

Plaintiff also takes issue with Dr. Gerson's statement that although Dr. Matthew reported that plaintiff had some level of anxiety and depression beginning on March 27, 2014, there was no evidence of plaintiff's post traumatic stress disorder, such as frequent and acute flashbacks, severe nightmares, "easy startability" and extreme anxiety with panic attacks. Plaintiff points to the symptoms she described to her providers, including "does not like to leave her house," high level anxiety that results in a racing heart in certain public settings, "starting to have nightmares and flashes and stuff," daily panic attacks and "only feels secure at home." However, as explained above, Dr. Matthew merely documented plaintiff's self-reports of her past symptoms without noting his observation or detailing the duration and severity of the symptoms or their effect on her ability to function in a work environment.

In his report, Dr. Gerson noted that plaintiff was not in active "psychopharm management," she had only minimal changes in her antidepressant regimen over the past three years; and Dr. Matthew was unable to comment on her medications. Gerson also found it significant that plaintiff was not in couples' therapy for her marital problems, did not attend Al-Anon and had no plan to see a psychiatrist. As an example of objective evidence, plaintiff points to Dr. Matthew's assignment of a global assessment of functioning score of 50 in March 2014. However, as with Vonck, Dr. Matthew did not explain how he reached this conclusion or what it meant in terms of plaintiff's specific functioning.

Further, Aetna acknowledged plaintiff's primary symptoms, panic attacks and the fact that she suffered from post traumatic stress disorder in its denial letter but found that she

34

failed to adduce sufficient medical evidence that these problems prevented her from working. Specifically, Aetna stated that even though plaintiff had post traumatic stress disorder and "marked" symptoms of anxiety and depression, there were no formal measurements of how those symptoms affected her functional capabilities.  E.g., Williams, 509 F.3d at 322–23 ("A distinction exists however, between the amount of fatigue or pain an individual experiences, which as Hawkins notes is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured.  Other circuits have drawn this same distinction.").  (Although plaintiff cites cases from other jurisdictions in an attempt to show that Williams applies only in cases involving self-reports of pain and not psychological symptoms, the Court of Appeals for the Seventh Circuit has not made this distinction.)  In light of the record before it, Aetna provided a reasoned explanation for its decision.  Militello v. Central States, Southeast & Southwest Areas Pension Fund, 360 F.3d 681, 686 (7th Cir. 2004) (decision will not be overturned if  possible to offer reasoned explanation based on evidence).

3.  Denial of second appeal

In its October 15, 2014 denial letter, Aetna repeated most of Dr. Schroeder's report verbatim and stated that it was denying plaintiff benefits because of "a lack of medical evidence (i.e. formal mental status examination findings, performance based test of psychological functioning with standardized scores, behavioral observations with frequency, duration, and intensity of symptoms observed, etc.) supporting a functional impairment that

would have prevented you from engaging in any occupation." AR, dkt. #31-5, at 98. As discussed above, plaintiff has not pointed to any persuasive evidence that contradicts Aetna's conclusion. Although plaintiff submitted additional letters from Dr. Matthew and Dr. Benn along with her second appeal, Dr. Schroeder concluded that there was no clinical information in the record to corroborate the presence of the number and severity of the psychiatric symptoms that she reported.

As she does with respect to the other reviewing physician reports, plaintiff criticizes Dr. Schroeder for making factual errors and mischaracterizations in his report regarding her self-reported symptoms. However, plaintiff's concerns relate primarily to symptoms that she believes Dr. Schroeder did not properly credit, including lack of sleep, inability to leave the house because of anxiety, waves of emotions and emotional numbing, failure to shower for two weeks on one occasion, concentration problems and nightmares. Although Dr. Schroeder may not have summarized all of plaintiff's symptoms in his report, he reviewed plaintiff's statements and those of her treating providers. In the end, he simply did not agree that her symptoms rose to the level of a functional impairment. He explained that an individual's subjective tolerance of her own activities may not reliably reflect her true capabilities, particularly when the individual is under stress. He further noted that functional examination findings such as mental status examinations, behavioral observations and the results of psychological or neuropsychological testing with validity scales help show how an individual's self-reported symptoms and difficulties relate to functional impairment. Although plaintiff argues that these are merely Dr. Schroeder's opinions, Aetna was entitled

36

to rely on them.  A review of the record confirms that there are very few examination findings from the relevant period in plaintiff's case.  The mental status examinations that were performed with respect to plaintiff's cognitive functioning did not yield significant findings. Although Dr. Matthew informed Aetna in July 2015 that he had conducted testing to confirm plaintiff's diagnosis of post traumatic stress disorder, he did not state that the test results shed any light on her ability to function in an occupational setting.  Although plaintiff and her providers may believe that her symptoms prevented her from performing any work, the reviewing physicians reached a different conclusion, which Aetna was entitled to accept.

4.  <u>Conclusion</u>

In sum, and contrary to plaintiff's assertions, Aetna provided well-founded reasons for each of its denials and relied properly on the reports of Drs. Schnur, Gerson and Schroeder. The reviewing physician reports demonstrate a thorough consideration of the available information.  Each of the reviewing physicians conducted an independent review of plaintiff's medical records dating back to July 2013 and communicated with her treating providers. They all found the medical findings insufficient to show that plaintiff had an ongoing functional impairment that precluded her from working in any occupation after July 2013. Although plaintiff self-reported having severe symptoms that limited her ability to function at times, the record contains no formal measurements of how those symptoms affected her functional capabilities.  Dr. Gerson and Dr. Schroeder also noted that there was little or inconsistent information about the duration, frequency and severity of some of plaintiff's

37

symptoms and that she was capable of activities (such as caring for her ill parents) that would disqualify her from long-term disability coverage.  Although plaintiff's treating providers reached different conclusions as to plaintiff's ability to work, under an arbitrary and capricious standard of review, I cannot make a determination between competing expert opinions.  <u>Davis</u>, 444 F.3d at 576, <u>Semien</u>, 436 F.3d at 812. Accordingly, I conclude that plaintiff's claim received a full and fair review and that the decision terminating her disability benefits has rational support in the record.


### B.  <u>Social Security Award</u>

Plaintiff asserts that Aetna acted arbitrarily and capriciously when it failed to consider her January 2009 award of disability benefits from the Social Security Administration.  She argues that because the test for social security benefits is substantially similar to the Plan's definition of disability (both require a showing that claimant be unable to perform any occupation) and the Plan required her to apply for social security benefits, the award is instructive and should have been relevant to Aetna's decision.

Plaintiff was awarded social security benefits in January 2009, after Aetna had approved her application for long-term disability benefits in December 2008.   Aetna terminated her long-term disability benefits five years later, when it determined that she did not have sufficient evidence to show that she still met the definition of disability under the Plan. Although plaintiff is correct that failing to consider the Social Security Administration's finding of disability may be evidence of arbitrary decision-making, a plan "administrator is

not forever bound by that determination." <u>Holmstrom</u>, 615 F.3d at 772-73 (citing <u>Metropolitan Life Insurance Co. v. Glenn</u>, 554 U.S. 105, 118 (2008)).  In addition, the Court of Appeals for the Seventh Circuit has "repeatedly emphasized that the SSA's determination of disability is not binding on employers under ERISA.  SSA determinations are often instructive, but they are not determinative." <u>Love v. National City Corp. Welfare Benefits Plan</u>, 574 F.3d 392, 398 (7th Cir. 2009) (citing <u>Mote v. Aetna Life Insurance Co.</u>, 502 F.3d 601, 610 (7th Cir. 2007)).

In this case, the social security decision was not relevant to Aetna's consideration of plaintiff's appeals because Aetna was considering additional evidence that was not before the Social Security Administration at the time it determined that plaintiff was disabled.  Plaintiff has not pointed to any updated findings of the Social Security Administration that contradict Aetna's 2014 decision.  Accordingly, I cannot conclude that Aetna's failure to adhere to a five-year old social security determination qualifies as arbitrary and capricious decision-making. <u>Trice v. Lilly Employee Welfare Plan</u>, 2013 WL 6804749, at *14 (S.D. Ind. Dec. 19, 2013) ("Given the Court's previous conclusion that the Plan's denial of benefits has rational support in the record and was not arbitrary and capricious, the Court concludes that its failure to distinguish the SSA's disability finding is not, in and of itself in this case, sufficient to warrant remand.").

## C.  Occupational Analysis

Plaintiff asserts that even though Aetna determined that she was no longer precluded

39

from working in any occupation, it did not identify what occupation it believed that she could perform, analyze the requirements of her former position or any other position, discuss her vocational skills with respect any occupation or conduct any other type of vocational analysis to support its decision.  As defendants point out, however, no categorical rule requires a plan administrator to provide the type of vocational analysis that plaintiff describes.  ERISA demands "a 'reasonable inquiry' into a claimant's medical condition and his vocational skills and potential."  O'Reilly v. Hartford Life & Accident Insurance Co., 272 F.3d 955, 961 (7th Cir. 2001) (citing Quinn v. Blue Cross and Blue Shield Association, 161 F.3d 472, 476 (7th Cir. 1998), abrogated on other grounds by Hardt v. Reliance Standard Life Insurance Co., 560 U.S. 242, 252-54 (2010)).  See also Quinn, 161 F.3d at 476 ("We agree that Calhoon was under no obligation to undergo a full-blown vocational evaluation of Quinn's job, but she was under a duty to make a reasonable inquiry into the types of skills Quinn possesses and whether those skills may be used at another job that can pay her the same salary range as her job with HCSC. . . . By not even performing the slightest inquiry into this matter, Calhoon made her decision arbitrarily and capriciously.").  The Court of Appeals for the Seventh Circuit has found that at a minimum, a plan must consider a claimant's qualifications in determining whether her impairment affects her ability to work.  Tate v. Long Term Disability Plan for Salaried Employees of Champion International Corp. No. 506, 545 F.3d 555, 560 (7th Cir. 2008), abrogated on other grounds by Hardt, 560 U.S. 242.  See also Feggins v. Reliance Standard Life Insurance Co., 2013 WL 4782726, at *5 (W.D. Wis. Sept. 6, 2013) (cases in which claim hinges on whether plaintiff is capable of performing "any"

40

occupation require "some sort of comparison between the requirements of the occupation and the applicant's capabilities.").

All of the reviewing physicians devoted the bulk of their reports to considering whether plaintiff's reported symptoms caused her any functional impairment. Although they did not identify any particular job that plaintiff could perform, they all considered her past work and found that there was no evidence that her symptoms caused her any functional impairment that would result in any particular restriction. Tate, 545 F.3d at 562 (claimant does not have "burden of demonstrating through a vocational expert that she is unable to perform any job for which she is qualified," but she must "provide[] evidence that she has an impairment that affects her ability to work"). As discussed at length above, the record provides rational support for those findings. Accordingly, because Aetna made a reasoned determination that plaintiff's medical condition did not cause her any work limitation, it had o need to consider the requirements of any particular job.


D.  Voluntary Appeal to Kraft

Plaintiff asserts that defendant Kraft's refusal to consider her voluntary appeal after granting her an extension to file one and permitting her to submit additional information was an arbitrary and capricious violation of the terms of the plan. She notes that Kraft waited until two months after she notified it of her intent to file the appeal to inform her that only claims denied solely on a plan provision, and not those based on a clinical determination of medical necessity, are eligible for the voluntary appeal process.

41

Regulations promulgated under ERISA require employee benefit plans providing disability benefits to establish and maintain reasonable procedures governing "appeal of adverse benefit determinations."  29 C.F.R. § 2560.503-1(b) and (d).  The regulations specifically state that such claims procedures must "not contain any provision, and [may] not [be] administered in a way, that requires a claimant to file more than two appeals of an adverse benefit determination prior to bringing a civil action under section 502(a) of the Act." § 2560.503-1(c)(2) and (d).  These two appeals are often referred to as "mandatory appeals." The regulations also allow plans to provide plan participants a voluntary appeal option, but they do not require claimants to exhaust this process before seeking judicial review.  Prezioso v. Prudential Insurance Co. of America, 748 F.3d 797, 805 (8th Cir. 2014); 29 C.F.R. § 2560.503-1(c)(3) and (d).  The plan at issue in this case provides for the two mandatory appeals and gives claimants the option of filing a voluntary appeal.  However, the ERISA regulations do not state expressly that a voluntary appeal procedure is part of the plan's statutory obligation under 29 U.S.C. § 1133 to provide "a full and fair review . . . of the decision denying the claim."

Plaintiff acknowledges this rule but argues that a plan administrator's decision is subject to federal court review for arbitrary and capricious decision-making when it chooses to engage in a voluntary appeal under the regulations.  Neither this court nor the Court of Appeals for the Seventh Circuit has addressed this issue.  The Court of Appeals for the Eighth Circuit has stated in dicta that the way a plan administrator handles a voluntary appeal "may be weighed as a factor in determining whether there was an abuse of discretion" in handling

the claim, Prezioso, 748 F.3d at 805 (citing Glenn, 554 U.S. at 115).  However, plaintiff has not cited any published authority supporting her position that an otherwise rational decision by a third-party claims administrator such as Aetna may be found arbitrary and capricious solely on the ground that the plan sponsor (here, Kraft) did not conduct a voluntary review provided for in the plan.

The Court of Appeals for the Eighth Circuit held in Prezioso that the ERISA "regulations do not provide that a voluntary appeal procedure is part of the plan's statutory obligation to provide 'full and fair review' of the initial decision." Id. As authority, it cited an unpublished decision from the Eastern District of New York in which the court held that ERISA's regulations cover only mandated appeals.  DaCosta v. Prudential Insurance Co. of America, 2010 WL 4722393, at *4–5 (E.D.N.Y. Nov. 12, 2010).  In analyzing the effect of ERISA on voluntary appeals that an insurer conducts after denying a mandated appeal, the district court reasoned in DaCosta that ERISA requires only one single full and fair review because it uses the term "a"; the regulations provide no substantive guidelines for conducting voluntary appeals, and public policy dictates against imposing additional procedural requirements on a party voluntarily doing more than the law requires.  Id. at 5.  More recent federal district court decisions have found the analysis in DaCosta to be well-reasoned and thorough.  Allen v. Unum Life Insurance Co. of America, 2016 WL 4571451, at *6 (E.D. Va. Sept. 1, 2016); Harvey v. Standard Insurance Co., 850 F. Supp. 2d 1269, 1280 (N.D. Ala. 2012), aff'd, 503 F. App'x 845 (11th Cir. 2013).  I find DaCosta persuasive, particularly in the absence of convincing authority to the contrary.  It makes sense that if the plan had no

obligation to provide any voluntary appeal process, Kraft's failure to permit it in a particular case cannot be a violation of ERISA.

In support of her position, plaintiff cites the unpublished case of <u>Ward v. Life Insurance Co. of North America</u>, 2009 WL 2740202, at *6 (M.D.N.C. Aug. 26, 2009), in which the district court held that the statutory requirement for a full and fair review applied to a voluntary appeal. In <u>DaCosta</u>, 2010 WL 4722393, at *5, the court considered the <u>Ward</u> decision but did not find it persuasive in light of the plain language of the applicable statute and regulations and public policy considerations. I agree. The court provided little rationale for its decision in <u>Ward</u>, stating only that "[w]hile it is true that Plaintiff's second appeal was 'voluntary' under ERISA, it does not necessarily follow that the plan administrator could ignore the appeal or not afford it a full and fair review." <u>Id.</u> Further, the facts in this case differ from those in <u>Ward</u>, in which the claimant appealed the denial of benefits to the claims administrator and then filed a second, voluntary appeal to the same claims administrator. Even if the way in which a plan administrator handles a second voluntary review may be relevant to an arbitrary and capricious review of its denial of a mandatory appeal, any mistake Kraft may have made in declining to conduct the voluntary review in plaintiff's case does not negate the full and fair review she received from Aetna during the mandatory appeal process. <u>Allen</u>, 2016 WL 4571451, at *6 (finding same where defendant allegedly misconstrued facts from record and relied on wrong Facebook profile for plaintiff in voluntary appeal). Kraft refused to address Aetna's decision on the merits; it did not consider any of plaintiff's medical evidence or deny her benefits on a new basis, both of which may have affected the outcome

44

of the mandatory appeal process conducted by Aetna. Id. (citing cases finding it significant that new information did not change prior appeal decision). Overturning what I have determined to be a rational decision on the part of Aetna solely because Kraft committed a procedural misstep does not make sense in this case.

Plaintiff also cites Jacquez on behalf of Jacquez v. Health & Welfare Department of Construction & General Laborers' District Council of Chicago & Vicinity, 2014 WL 6888459, at *6 (N.D. Ill. Dec. 4, 2014), for the view that if a plan allows a voluntary appeal, all materials submitted for the appeal must be considered part of the administrative record because "[o]therwise, it would be impossible to say whether the voluntary appeal's result was arbitrary or capricious." The citation is not on point because Kraft did not undertake a review of plaintiff's voluntary appeal or consider the merits of Aetna's decision.

In a separate argument, plaintiff cites Swaback v. American Information Technologies Corp., 103 F.3d 535, 540 (7th Cir. 1996), for the position that "if fiduciaries or administrators of an ERISA plan controvert the plain meaning of a plan, their actions are arbitrary and capricious." The summary plan description in this case clearly provides that the voluntary appeal is optional and that Kraft retains discretion as the plan sponsor to decide whether to pay claims under the voluntary appeal process. There is no discussion of eligibility. At most, the plan allows a claimant or her representative to file a voluntary appeal; it does not promise that Kraft will hear the appeal. In fact, the summary plan description explains that Kraft will give the claimant "a final decision" on the "appeal" within 60 days after it is received and "may take" up to an additional 60 days to "review" the claim. In other

45

words, the summary plan description distinguishes between a decision on the appeal and the claim review, suggesting that there are cases in which it may not accept an appeal for a claim review.  In light of this language and Kraft's discretionary authority over the voluntary appeal process, I cannot find that Kraft contradicted the plain meaning of the plan by telling plaintiff that clinical determinations of medical necessity are not eligible for the voluntary appeal process.


E.  Kraft's Conflict of Interest

In a brief argument, plaintiff asserts that defendant Kraft has a conflict of interest because it has the discretion to pay claims under the voluntary appeals process and it funds the payment of approved claims.  Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 111-12 (2008) (noting conflict exists where employer both funds plan and evaluates claims under it).  She argues that this conflict of interest should be a factor in the court's analysis of Kraft's actions with respect to her voluntary appeal.  Id. at 116-17 (finding that conflict is one factor among many that reviewing judge must take into account and may act as tie breaker when other factors are closely balanced).

As discussed above, I have determined that Kraft's actions with respect to the voluntary appeal are not subject to an arbitrary and capricious review.  Therefore, it is unnecessary to consider Kraft's potential conflict of interest.  Further, even if plaintiff's argument were relevant, the Court of Appeals for the Seventh Circuit has held that in weighing the potential conflict of interest of a plan administrator, "[i]t is . . . not the existence

46

of a conflict of interest—which is a given in almost all ERISA cases—but the gravity of the conflict, as inferred from the circumstances, that is critical." Marrs v. Motorola, Inc., 577 F.3d 783, 789 (7th Cir. 2009).  Apart from noting that Kraft had competing interests with respect to its responsibilities under the plan, plaintiff has not adduced any evidence that a serious conflict of interest influenced Kraft's decision. Id. ("There are no indications in this case . . . that the plan administrator labored under a conflict of interest serious enough to influence his decision consciously or unconsciously-a decision that was otherwise entirely reasonable-decisively."); Mers v. Marriott International Group Accidental Death & Dismemberment Plan, 144 F.3d 1014, 1020 (7th Cir. 1998) ("We presume that a fiduciary is acting neutrally unless a claimant shows by providing specific evidence of actual bias that there is a significant conflict.  The existence of a potential conflict is not enough.").


## ORDER

IT IS ORDERED that

1.   The motion for summary judgment filed by defendants Kraft Heinz Foods Company, Aetna Life Insurance Company and Kraft Foods Group, Inc. Employee-Paid Group Benefits Plan, dkt. #48, is GRANTED with respect to plaintiff's claim that defendants violated 29 U.S.C. § 1132(a)(1)(B) and the voluntary appeal.  The ruling on defendants' request for an award of attorney fees and costs is DENIED without prejudice to their filing an appropriate motion under Fed. R. Civ. P. 54(d)(2)(B).

2.   Plaintiff Kathy Jacowski's motion for summary judgment, dkt. #53, is DENIED.

3.  Defendants' motion to strike paragraphs 3 and 4 and exh. #1 of the declaration of Brianna Covington, dkt. #68 (citing dkt. #56), is GRANTED.

Entered this 14th day of November, 2016.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

48